FILED

Oct 23 2020

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY          s/ megarb          DEPUTY

Ronald Karz
State Bar #134764
MUELLER LAW, PLLC
404 W. 7th Street
Austin, Texas 78701
(512) 478-1236
ronald.karz@muellerlaw.com

Attorney for Plaintiffs

# UNITED STATES DISTRICT COURT for
## the SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA and the STATE OF CALIFORNIA *ex rel.* [UNDER SEAL],<br><br>Plaintiffs,<br><br>v.<br><br>[UNDER SEAL],<br><br>Defendants. | Civ. Action No. **'20 CV2085 GPC BLM**<br><br>**QUITAM COMPLAINT**<br>**FILED UNDER SEAL**<br>**PURSUANT TO**<br>**31 U.S.C. § 3730(b)2**<br>**DEMAND FOR JURY TRIAL** |

**FILED**

Oct 23 2020

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ s/ meganb _____ DEPUTY

Ronald Karz
State Bar #134764
MUELLER LAW, PLLC
404 W. 7th Street
Austin, Texas 78701
(512) 478-1236
ronald.karz@muellerlaw.com

Attorney for Plaintiffs

# UNITED STATES DISTRICT COURT for
## the SOUTHERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA and the
STATE OF CALIFORNIA
*ex rel.* Charles Lewis, Jr.

    Plaintiffs,

       v.

INTERGRO RESOURCES, INC. d/b/a
INTERGRO REHAB SERVICES,
HERITAGE GARDENS HEALTHCARE
PROPERTIES, LLC d/b/a PROGRESSIVE
HEALTH CARE CENTERS, and OPTIMA
HEALTHCARE SOLUTIONS, LLC.

    Defendants.

Civ. Action No. **'20 CV 2085 GPC BLM**

**QUITAM COMPLAINT
FILED UNDER SEAL
PURSUANT TO
31 U.S.C. § 3730(b)2
DEMAND FOR JURY TRIAL**

## COMPLAINT

On behalf of the United States of America, Relator Charles Lewis, Jr. files this *qui tam* Complaint against Defendants INTERGRO RESOURCES, INC. d/b/a INTERGRO REHAB SERVICES, HERITAGE GARDENS HEALTHCARE PROPERTIES, LLC d/b/a PROGRESSIVE HEALTH CARE CENTERS, and OPTIMA HEALTHCARE SOLUTIONS, LLC. and alleges as follows:

Ronald Karz
State Bar #134764
MUELLER LAW, PLLC
404 W. 7th Street
Austin, Texas 78701
(512) 478-1236
ronald.karz@muellerlaw.com

Attorney for Plaintiffs

## UNITED STATES DISTRICT COURT for
## the SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA and the STATE OF CALIFORNIA *ex rel.* [UNDER SEAL], | Civ. Action No. _____ |
| Plaintiffs, | **QUITAM COMPLAINT FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)2 DEMAND FOR JURY TRIAL** |
| v. | |
| [UNDER SEAL], | |
| Defendants. | |

1  Ronald Karz
   State Bar #134764
2  MUELLER LAW, PLLC
   404 W. 7th Street
3  Austin, Texas 78701
   (512) 478-1236
4  ronald.karz@muellerlaw.com

5  Attorney for Plaintiffs

6

7              **UNITED STATES DISTRICT COURT for**
                **the SOUTHERN DISTRICT OF CALIFORNIA**
8

9  UNITED STATES OF AMERICA and the
   STATE OF CALIFORNIA                        Civ. Action No. _____
10 *ex rel.* Charles Lewis, Jr.

11                                            **QUITAM COMPLAINT**
       Plaintiffs,                           **FILED UNDER SEAL**
12                                            **PURSUANT TO**
                                              **31 U.S.C. § 3730(b)2**
13         v.                                 **DEMAND FOR JURY TRIAL**

14

15 INTERGRO RESOURCES, INC. d/b/a
   INTERGRO REHAB SERVICES,
16 HERITAGE GARDENS HEALTHCARE
   PROPERTIES, LLC d/b/a PROGRESSIVE
17 HEALTH CARE CENTERS, and OPTIMA
   HEALTHCARE SOLUTIONS, LLC.
18

19     Defendants.

20

21                   **COMPLAINT**

22      On behalf of the United States of America, Relator Charles Lewis, Jr. files this *qui tam*

23 Complaint against Defendants INTERGRO RESOURCES, INC. d/b/a INTERGRO REHAB

24 SERVICES,   HERITAGE   GARDENS   HEALTHCARE   PROPERTIES,   LLC   d/b/a

25 PROGRESSIVE HEALTH CARE CENTERS, and OPTIMA HEALTHCARE SOLUTIONS,

26 LLC. and alleges as follows:

27

28

                        - 1 -

**INTRODUCTION**

1.	This is an action to recover treble damages and civil penalties on behalf of the United States of America and the State of California arising from false statements or records and false or fraudulent claims made or caused to be made by INTERGRO RESOURCES, INC. d/b/a INTERGRO REHAB SERVICES, HERITAGE GARDENS HEALTHCARE PROPERTIES, LLC d/b/a PROGRESSIVE HEALTH CARE CENTERS ("Progressive"), and OPTIMA HEALTHCARE SOLUTIONS, LLC ("Optima") (collectively: "Defendants") to the United States of America and private insurers in violation of the False Claims Act, 31 U.S.C. § 3729, et seq ("FCA") and the California Insurance Fraud Prevention Act, California Insurance Code §1871.7. ("IFPA").

2.	The false or fraudulent claims and statements at issue involve payments made by Government-funded health plans such as Medicare and other programs, for therapy and other related services administered at skilled nursing facilities ("SNF") throughout the State of California.

3.	The estimated total damages to the United States from these false and fraudulent claims and statements are significant.

**PARTIES**

4.	Defendant Intergro Resources, Inc. ("Intergro") is a California corporation (entity number C2329130) with a principle office located at 1922 N. Broadway in Santa Ana, California.

5.	Intergro is a contract therapy company that provides physical, occupational and speech therapy services in various post-acute care settings throughout the State of California including at Fallbrook Skilled Nursing (325 Potter Street, Fallbrook, California) ("Fallbrook Facility").

-2-

6.      Between 90% and 99% of the patients at the Fallbrook Facility are Medicare beneficiaries.

7.      Defendant Progressive Health Care Centers ("Progressive") is a California limited liability company (entity number 199736510086) with a principle office located at 25271 Barton Road in Loma Linda, California.

8.      Defendant Progressive owns and administers at least six post-acute care settings throughout the State of California, including the Fallbrook Facility.

9.      Defendant Optima Healthcare Solutions, LLC ("Optima") is a Florida limited liability company registered to do business in the State of California since July 2015 under the following entity number: 201518210465.

10.     Optima's principle office is at 4299 SW High Meadows Ave in Palm City, Florida. Optima provides SNFs with "therapy management" software as well as billing support.

11.     Optima provides such services to skilled nursing facilities throughout the country including those serviced by Intergro and owned or administered by Progressive.

12.     The Fallbrook Facility does not appear to have its own business registration with the California Secretary of State. Upon information and belief, the Fallbrook Facility is owned and administered by Progressive with therapy services provided ·by Intergro and billing services provided by Optima.

13.     Relator Charles H. Lewis, Jr., a citizen and resident of the State of California, is a retired police officer.

14.     Relator graduated with Honors from Professional Skills Institute in March, 1998 with an Associate Science Degree in Physical Therapy Assistant.

15.     After graduation, Relator worked as a physical therapist assistant ("PTA") for North County & Escondido Physical Therapy, in Escondido, CA, from 1998 – 2003; for Tri-City Physical Therapy & Hand Center, in Vista, CA, from 2003-2008; for Amedisys, Inc. from 2008 to 2011 and for the Graybill Medical Group from 2011 to 2016.

16.     In his various positions as a PTA, Mr. Lewis gained experience and exhibited proficiency in many areas of physical therapy including, but not limited to, outpatient orthopedic rehabilitation, aquatic therapy, joint mobilization, acute/sub-acute inpatient care, and vestibular/fall prevention in the home care setting.

17.     Integro hired relator in or about 2016 as a PTA to assist in delivering physical therapy treatment to patients at the Fallbrook Facility where he presently works.

### JURISDICTION AND VENUE

18.     Venue and jurisdiction are the same under the FCA. 31 U.S.C. § 3732. An action may be brought in any judicial district in which any Defendants may be found or in which any proscribed act occurred. 31 U.S.C. § 3732(a).

19.     The United States District Court for the Southern District of California has jurisdiction and venue for any Complaint brought in the matter because one of the Defendants is located in this district and many of the proscribed acts occurred in this district.

20.     Relator is unaware that the allegations in this Complaint have been publicly disclosed. Further, to the extent that any of the information in this Complaint has been publicly disclosed, Relator's allegations in this Complaint are not based on such public disclosures.

21.     Additionally, Relator is an original source of the information upon which Relator's allegations are based because he has direct and independent knowledge of it.

22.     Pursuant to 31 U.S.C. § 3730(b)(2), the Relator must provide the Government with a copy of the Complaint and/or a written disclosure of substantially all material evidence and material information in their possession contemporaneous with the filing of the Complaint.

23.     Relator has complied with this provision by serving his pre-suit Disclosure Statement with attached exhibits upon Joseph Price, Assistant United States Attorney for the Southern District of California.

24.     In further compliance with 31 U.S.C. §3730(b)(2), relator shall, contemporaneously with the filing of this Complaint, serve copies of this Complaint upon the United States Attorney for the Southern District of California and on the Honorable William Barr, Attorney General of the United States.

25.     In further compliance with 31 U.S.C. § 3730(b)(2), this Complaint is being filed *in camera* and will remain under seal for a period of at least sixty days and shall not be served on the Defendants until the Court so orders.

## LEGAL FRAMEWORK

### I.     THE FEDERAL FALSE CLAIMS ACT

26.     Originally enacted in 1863, Congress substantially amended the FCA in 1986. The 1986 amendments enhanced the Government's ability to recover losses sustained as a result of fraud against the United States.

27.     Further clarifying amendments were adopted in May 2009 and March 2010. The FCA imposes liability upon any person who "knowingly presents, or causes to be presented [to the Government] a false or fraudulent claim for payment or approval;" or "knowingly makes, uses or causes to be made or used, a false record or statement material to a false or fraudulent claim;" or "knowingly makes, uses, or causes to be made or used, a false record or statement material to an

obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." 31 U.S.C. 3729(a)(1)(A), (B), (G).

28.    Any person found to violate these provisions is liable for a civil penalty of up to $11,000 for each such false or fraudulent claim, plus three times the amount of the damages sustained by the Government.

29.    Significantly, the FCA imposes liability where the conduct is merely "in reckless disregard of the truth or falsity of the information" and further clarifies that "no proof of specific intent to defraud is required." 31 U.S.C. 3729(b)(1).

30.    The FCA also broadly defines a "claim" as one that includes "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that — (i) is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government — (i) provides or has provided any portion of the money or property requested or demanded; or (ii) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded." 31 U.S.C. § 3729(b)(2)(A).

31.    The FCA empowers private persons with information regarding a false or fraudulent claim against the Government to bring an action on behalf of the Government and to share in any recovery – i.e. a *qui tam* provision.

32.     The complaint must be filed under seal without service on any Defendants. The complaint remains under seal while the Government conducts an investigation of the allegations in the complaint and determines whether to intervene in the action. 31 U.S.C. § 3730(b).

## II.     FEDERALLY FUNDED HEALTH INSURANCE PROGRAMS

### a.  Medicare

33.     Medicare is a federally-funded health insurance program for the elderly and persons with certain disabilities, providing both hospital insurance.  Medicare Part A covers the cost of inpatient hospital services and post-hospital nursing facility care, and medical insurance.  Medicare Part B covers the cost of the physician's services such as services to patients who are hospitalized, if the services are medically necessary and personally provided by the physician.

34.     Medicare payments come from the Medicare Trust Fund, which is funded primarily by payroll deductions taken from the United States work force through mandatory Social Security deductions.

35.     Medicare is generally administered by the Centers for Medicare and Medicaid Services ("CMS"), which is an agency of the Department of Health and Human Services ("HHS"). CMS establishes rules for the day-to-day administration of Medicare. CMS contracts with private companies to handle the day-to-day administration of Medicare.

36.     CMS, through contractors, maintains and distributes fee schedules for the payment of physician services. These schedules specify the amounts payable for defined types of medical services and procedures.

37.     Although Medicare is a national program, it adjusts fee-for-service payments to providers for geographic differences in the cost of providing care.

38.     CMS adjusts Medicare fee-for-service payments to practitioners and hospitals according to the geographic location in which the provider practices, recognizing that some costs are beyond the providers' control.

39.     Payments in high-cost areas are increased relative to the national average, and payments in low-cost areas are reduced.  This known as a "geographic adjustment factor" and is specifically authorized in 42 C.F.R. § 416.26.

### b.  Tricare

40.     TRICARE is a federal program which provides civilian health benefits for military personnel, military retirees, and their families.  TRICARE is administered by the Department of Defense and funded by the Federal Government.  *See* 32 C.F.R. 199.17.  At all relevant times to this matter, applicable TRICARE regulations relating to coverage of claims by providers and physicians have been substantially similar in all material respects to the applicable Medicare provisions described above.

41.     Medicare, Medicaid, TRICARE, and other similar federal programs are referred to collectively herein as "Government-funded health plans."

## III.     MEDICARE COVERAGE OF SNF REHABILITATION THERAPY

42.     Congress established the Medicare Program in 1965 to provide health insurance coverage for individuals aged 65 or older and for people with certain disabilities or afflictions.  *See* 42 U.S.C. §§ 426, 426A.

43.     The Medicare program is divided into four "Parts" that cover different services. Part A generally covers inpatient hospital services, home health and hospice care, and skilled nursing and rehabilitation care. For rehabilitation therapy to qualify for the Part A SNF benefit, the following conditions must be met:  (1) the patient must require skilled nursing care or skilled

rehabilitation services (or both) on a daily basis; (2) the daily skilled services must be services that, as a practical matter, can only be provided in a skilled nursing facility on an inpatient basis; and (3) the services are provided to address a condition for which the patient received treatment during a qualifying hospital stay, or for a condition that arose while the patient was receiving care in a SNF (for a condition treated during the hospital stay). 42 U.S.C. § 1395f(a)(2)(B); 42 C.F.R. § 409.31(b).

44.     Subject to these requirements, Medicare Part A covers up to 100 days of skilled nursing and rehabilitation care for a benefit period *(i.e.,* spell of illness) following a qualifying hospital stay of at least three consecutive days. 42 U.S.C. § 1395d(a)(2)(A); 42 C.F.R. § 409.61(b), (c).

45.     Medicare requires that a physician or certain other practitioners certify that these requirements are met at the time of a patient's admission to the SNF and re-certify the patient's continued need for skilled rehabilitation therapy services at regular intervals thereafter. *See* 42 U.S.C. § 1395f(a)(2)(B); *See also* Medicare General Information, Eligibility, and Entitlement Manual, Ch. 4, § 40.3.

46.     Medicare Part A will only cover those services that are "reasonable" and "necessary." *See* 42 U.S.C. § 1395y(a)(1)(A). "[N]o payment may be made under part A or part B of this subchapter for any expenses incurred for items or services . . . which . . . are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." *Id.*

47.     In the context of skilled rehabilitation therapy, this means that the services must be (1) consistent with the nature and severity of the patient's individual illness, injury, or particular

medical needs; (2) consistent with accepted standards of medical practice; and (3) reasonable in duration and quantity.[1]

48.    To assess the reasonableness and necessity of skilled rehabilitation therapy services and determine whether reimbursement is appropriate, Medicare requires proper and complete documentation of the services rendered to beneficiaries.   In particular, the Medicare statute provides that:

> The Secretary shall periodically· determine the amount which should be paid under this part to each provider of services with respect to the services furnished by it, and the provider of services shall be paid, at such time or times as the Secretary believes appropriate (but not less often than monthly) and prior to audit or settlement by the Government Accountability Office, from the Federal Hospital Insurance Trust Fund, the amounts so determined, with necessary adjustments on account of previously made overpayments or underpayments; except that no such payments shall be made to any provider unless it has furnished such information as the Secretary may request in order to determine the amounts due such provider under this part for the period with respect to which the amounts are being paid or any prior period.

42 U.S.C. § 1395g(a)

## IV.    MEDICARE PAYMENT FOR SNF REHABILITATION THERAPY

49.    Under its prospective payment system ("PPS"), Medicare pays a nursing facility a pre-determined daily rate for each day of skilled nursing and rehabilitation services it provides to a patient. *See* 42 C.F.R. 412 *et seq.*[2] The daily PPS rate that Medicare pays a nursing facility depends, in part, on the Resource Utilization Group ("RUG") to which a patient is assigned.   Each

---

[1] *See See* Medicare Benefit Policy Manual, Ch. 8, § 3.

[2] See Exhibit 8.

distinct RUG is intended to reflect the anticipated costs associated with providing nursing and rehabilitation services to beneficiaries with similar characteristics or resource needs.

50.    In general, there are five RUG levels for patients that require rehabilitation therapy: Rehabilitation Ultra High ("RU"); Rehabilitation Very High ("RV"); Rehabilitation High ("RH"); Rehabilitation Medium ("RM"); and Rehabilitation Low ("RL").

51.    The RUG level to which a patient is assigned depends upon both the number of skilled therapy minutes and the number of therapy disciplines the patient received during a seven-day assessment period. The chart below reflects the requirements for the five rehabilitation RUG levels under the RUG-III classification system.

| Rehabilitation RUG Level | Requirements to Attain RUG Level |
|---|---|
| RU = Ultra High | 1. Minimum 720 minutes per week total therapy<br>2. At least two therapy disciplines<br>3. One discipline must be provided at least 5 days/week |
| RV =Very High | 1. Minimum 500 minutes per week total therapy<br>2. One therapy discipline must be provided at least 5 days/week |
| RH=High | 1. Minimum 325 minutes per week total therapy<br>2. One therapy discipline must be provided at least 5 days/week |
| RM=Medium | 1. Minimum 150 minutes per week total therapy<br>2. Therapy must be provided at least 5 days/week<br>3. Can be any mix of therapy disciplines |
| RL=Low | 1. Minimum 45 minutes per week total therapy<br>2. Therapy must be provided at least 3 days/week<br>3. Can be any mix of therapy disciplines |

Source: 63 Fed. Reg. 25,252 at 26,262.

52.    Medicare pays the highest rate for those beneficiaries that fall into the Ultra High RUG level. This level is "intended to apply only to the most complex cases requiring rehabilitative therapy well above the average amount of service time." *Id.* at 26,258.

53.    Medicare reimbursement also varies within each RUG level depending on: 1) the patient's ability to perform certain activities of daily living ("ADL"), such as eating, using the toilet, bed mobility, and transfers (e.g., from a bed to a chair); and 2) the extent to which the patient

1 | needs "extensive services" such as intravenous treatment, a ventilator, tracheostomy, or suctioning.

2 | *Id.*

3 | **V.      TRICARE COVERAGE OF SNF REHABILITATION THERAPY**

4 | 54.      TRICARE is a federally funded medical benefit program established by statute. 10

5 | U.S.C. §§ 1071-1110. TRICARE provides healthcare benefits to eligible beneficiaries, including

6 | active duty service members, retired service members, and their dependents. TRICARE covers the

7 | same skilled nursing services as Medicare.  The regulatory authority implementing the TRICARE

8 | program provides reimbursement to healthcare providers applying the same reimbursement

9 | scheme and coding parameters that the Medicare program applies.  10 U.S.C. §10790(2) (2006),

10 | re-designated as §1079(i)(2), Pub. L. No. 11 -291, Sec. 703 (Dec. 19, 2014) (institutional

11 | providers).

12 | 55.      TRICARE, like Medicare, reimburses only for "medically necessary services and

13 | supplies required in the diagnosis and treatment of illness or injury."  32 C.F.R. § 199.4(a)(l)(i).

14 | TRICARE follows Medicare's PPS and RUGs methodology and assessment schedule. TRICARE

15 | Reimbursement Manual 6010.58-M, Ch. 8, § 2, 4.3.5-4.3.7, 4.4.3.

16 | 56.      Under the TRICARE for Life program, certain beneficiaries who are enrolled in

17 | Medicare are still eligible for TRICARE benefits.  For these individuals, known as "TRICARE

18 | dual eligible beneficiaries," TRICARE is the secondary payer to Medicare and is responsible to

19 | the SNF for any amounts not covered by Medicare. *Id.* at 4.4.

20 | 57.      When a TRICARE dual eligible beneficiary receives coverage under the Medicare

21 | program, Medicare is the primary payer and TRICARE pays the portion not paid by Medicare. 32

22 | C.F.R. § 199.8.  When TRICARE is the primary insurer for a beneficiary, TRICARE reimburses

23 | consistent with Medicare rules and regulations pertaining to SNFs.  TRICARE Reimbursement

24 | Manual 6010.58-M, Ch. 8, § 2, 4.3.5- 4.3.7, 4.4.3

58.     Under TRICARE regulations, providers of medical services must maintain accurate medical records that identify the specific treatment provided to the patient and the patient's response to that treatment. 32 C.F.R. § 199.7(b)(3).  Providers of medical services must also provide information and records to TRICARE or its fiscal intermediaries on request to receive payment.  TRICARE prohibits practices such as submitting claims for services which are not medically necessary, consistently furnishing medical services that do not meet accepted standards of care and failing to maintain adequate medical records. 32 C.F.R. §§ 199.9(b)(3), (b)(5).

59.     For  TRICARE  dual  eligible  beneficiaries,  TRICARE  follows  Medicare's determination regarding medical necessity and TRICARE will make payment without further independent review of the claims. If services are determined not to be necessary under Medicare, they are not covered under TRICARE. TRICARE Reimbursement Manual 6010.58- M, Ch. 8, § 2, 4.3.16.

## VI.     OVERVIEW OF THE CALIFORNIA INSURANCE FRAUD PREVENTION ACT

60.     Insurance fraud imposes significant costs on the public and insurers, even if an insurer ultimately discovers the fraud and denies the fraudulent claim.

61.     Most states limit a defrauded insurer's remedies to breach of contract and fraud actions, which typically allow an insurer to recover its damages and rescind the policy, however, California provides another option.

62.     The California Insurance Fraud Prevention Act ("IFPA"), California Insurance Code §1871.7, is a powerful tool designed to prevent and punish insurance fraud through the imposition of significant penalties.

63.     California enacted the IFPA in 1989 after finding that rampant insurance fraud contributed substantially to rising premium costs, and the Government needed assistance to prosecute the fraud.

64.     Unlike most state insurance fraud statutes — which authorize only the government to prosecute insurance fraud — the IFPA authorizes "interested persons, including an insurer, [to] bring a civil action for [insurance fraud] for the person and for the State of California." Cal. Ins. Code § 1871.7(e)(1).

65.     The action must be brought in the name of the state and filed under seal to provide the Government the opportunity to investigate and determine whether to intervene.

66.     Generally, if the Government does not intervene, the court unseals the complaint and the person who brought the action — often referred to as the relator — proceeds with the action.

67.     If the Government intervenes, the relator remains involved, but the Government has the primary responsibility for prosecuting the action.

68.     To achieve its objectives, the IFPA imposes significant monetary penalties on persons who violate the IFPA or Penal Code §§549-551 by, among other things, submitting fraudulent insurance claims. The IFPA prescribes penalties between $5,000 and $10,000 plus an assessment of not more than three times the amount of the claim. Cal. Ins. Code § 1871.7(b).

69.     The prescribed penalty is assessed for each fraudulent claim submitted to an insurer.

70.     Significantly, because the violation occurs upon completion of the proscribed act, the IFPA does not require proof that the insurer paid the fraudulent claim to justify the assessment of penalties. It only requires proof that the unlawful act led to the fraudulent claim.

71.     The IFPA does not define the term "fraudulent claim," a California Appellate Court recently held that the "'fraudulent claim' requirement broadly refers to claims that are in some manner deceitful, and is not limited to claims that contain an express misstatement of fact."

72.     A "fraudulent claim" is one that is "characterized in any way by deceit" or "that result[s] from conduct that is done with an intention to gain unfair or dishonest advantage."

73.     In other words, what starts off as a legitimate claim may become fraudulent if the insured inflates the claim, conceals material facts about it or misrepresents any portion of it, to gain an unfair or dishonest advantage, such as a *greater payout*.

## DEFENDANT'S IMPROPER CONDUCT

74.     From approximately 2016 and continuing to the present, Defendants, through their executives, officers, managers, directors and employees, deliberately and without regard for patient need, inflated their reimbursements rates for services provided to patients covered by Government-funded health insurance programs.   To increase reimbursement rates for skilled nursing facility stays and the therapy administered during those stays, Defendants deliver excessive therapy to patients without regard for patient need to elevate the RUG classification of such patients.

75.     Typically, when a patient is first-admitted to an SNF and before a plan of care is established for that patient, he or she must undergo an evaluation by a licensed therapist. These evaluations are reported to Government-funded health plans under the following CPT codes:

- 97161 – Physical therapy evaluation, low complexity, typically 20 minutes spent face-to-face with the patient and/or family;

- 97162 – Physical therapy evaluation, moderate complexity, typically 30 minutes spent face-to-face with the patient and/or family;

- 97163 – Physical therapy evaluation, high complexity, typically 45 minutes spent face-to-face with the patient and/or family;

- 97165 – Occupational therapy evaluation, low complexity, typically 20 minutes spent face-to-face with the patient and/or family;

- 97166 – Occupational therapy evaluation, moderate complexity, typically 30 minutes spent face-to-face with the patient and/or family;

- 97167 – Occupational therapy evaluation, high complexity, typically 45 minutes spent face-to-face with the patient and/or family;

76.     According to Relator, physical and occupational therapists at the Fallbrook Facility typically perform their patient evaluations concurrently and then report their times separately. Further, *regardless of patient need, every evaluation performed at the Fallbrook Facility is reported as a "high complexity" evaluation.* That is to say, for example, the physical and occupational therapist will evaluate a patient at the same time, over the course of a single 45 minute period.

77.     Following the evaluation, each therapist submits an independent report that he or she evaluated the patient for 45 minutes (CPT 97167 or 97163). Defendants then use this inflated report to justify placing the patient in a higher RUG and thus, improperly billing Government-funded health plans at a higher reimbursement rate.

78.     Defendants' reimbursement claims to Medicare show that all patients receive the highest level of therapeutic services regardless of medical need for the purpose of increasing reimbursements.

79.     According to the Relator, the Defendants also delayed discharges for patients in higher level RUGs and accelerate discharges for patients in lower level RUGs all to make the most money.

80.     According to Relator, this pattern of overbilling repeats itself for virtually every therapy patient at the Fallbrook Facility. The following are three specific examples of patients for whom this pattern of overbilling occurred.

- Patient A, a Medicare patient, was admitted to the Fallbrook Facility in September 2016 complaining of back pain. The patient was 72 years old at the time. A physical therapist and an occupational therapist concurrently evaluated the patient for approximately 45 minutes. Subsequently, the Defendants billed a Government-funded health-plan for two evaluation sessions of 45 minutes each for a total of 90 minutes.

- Patient B, a Medicare patient, was admitted to the Fallbrook Facility in the Fall of 2017 suffering from Parkinson's Disease. A physical therapist and an occupational therapist concurrently evaluated the patient for approximately 45 minutes. Subsequently, the Defendants billed a Government-funded health-plan for two evaluation sessions of 45 minutes each for a total of 90 minutes.

- Patient C, a Medicare patient, was admitted to the Fallbrook Facility in complaining of gait instability. The patient was 82 years old at the time. A physical therapist and an occupational therapist concurrently evaluated the patient for approximately 45 minutes. Subsequently, the Defendants billed a Government-funded health-plan for two evaluation sessions of 45 minutes each for a total of 90 minutes.

- Patient D, a Medicare patient, was a 70 year old Medicare patient admitted to the Fallbrook Facility in March 2018 for "decline in function." A physical therapist and an occupational therapist concurrently evaluated the patient for approximately 45 minutes. Subsequently, the Defendants billed a Government-funded health-plan for two evaluation sessions of 45 minutes each for a total of 90 minutes.

- Patient E, a Medicare patient, was an 82 Medicare patient admitted to the Fallbrook Facility in March 2018 for gait instability. A physical therapist and an occupational therapist

concurrently evaluated the patient.  Subsequently, the Defendants billed a Government-funded health-plan for two evaluation sessions of 45 minutes each for a total of 90 minutes.

- Patient F, a Tricare patient, was admitted to the Fallbrook Facility in early 2018. A physical therapist and an occupational therapist concurrently evaluated the patient.  Subsequently, the Defendants billed a Government-funded health-plan for two evaluation sessions of 45 minutes each for a total of 90 minutes

- Patient G, a BlueCross Blue Shield patient was admitted to the Fallbrook facility in early 2018. A physical therapist and an occupational therapist concurrently evaluated the patient. Subsequently, the Defendants billed a Government-funded health-plan for two evaluation sessions of 45 minutes each for a total of 90 minutes.

81.     Relator witnessed this activity firsthand at the Fallbrook Facility.   Upon information and belief, the same conduct occurs at all SNF's owned and operated by Progressive, serviced by Intergro or for whom Optima provides billing support.

## DEFENDANTS' UNLAWFUL PRACTICES EXPOSED PATIENTS TO RISK OF UNNECESSARY HARM.

82.     Defendants' conduct exposed patients to risk of unnecessary harm.  Many patients are simply not in a condition to benefit from or to participate in therapy.  Forcing these patients to undergo therapy sessions so that the Defendants can classify them in a higher RUG simply raises the patients' risk of injury in exchange for a higher reimbursement rate for the Defendants.

## CONCLUSION

83.     The false claims alleged herein pertain to the submission of false or fraudulent claims to the United States Government concerning Government-funded health programs which resulted in remuneration unlawfully received by Defendants.

84.     It is alleged that the aforementioned conduct violates the False Claims Act, including, but not limited to, the following: 31 U.S.C. § 3729(a)(1)(A); 31 U.S.C. § 3729(a)(1)(B); 31 U.S.C. § 3729(a)(1)(C); 31 U.S.C. § 3729(a)(1)(D); 31 U.S.C. § 3729(a)(1)(E); 31 U.S.C. § 3729(a)(1)(F); and 31 U.S.C. § 3729(a)(1)(G).

85.     In light of the foregoing, Defendants are liable to the United States for civil penalties and statutory damages.

86.     The estimated total damages to the United States from the false and fraudulent claims and statements made as a result of the aforementioned actions are significant.

## CLAIMS FOR RELIEF

### COUNT I
### False Claims Act: Presentation of False Claims
### 31 U.S.C. § 3729(a)(1)(A)

87.     Relator repeats and incorporates by reference the allegations above as if fully contained herein.

88.     As more particularly set forth in the foregoing paragraphs, by virtue of the acts alleged herein, Defendants have "knowingly present[ed], or cause[d] to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval" in violation of 31 U.S.C. § 3729(a)(1).

89.     As a result of Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial, and the United States is entitled to at least $5,000 and as much as $11,000 for each such false or fraudulent claim submitted on or before November 2, 2015 and up to $21,563 for violations committed after November 2, 2015, plus three times the amount of the damages sustained by the Government for each and every violation of 31 U.S.C. § 3729 arising from Defendants' unlawful conduct as described herein. See 28 C.F.R. §§ 85.3(a)(9).

## COUNT II
### False Claims Act: Making or Using a False Record
### or Statement to Cause Claim to be Paid
### 31 U.S.C. § 3729(a)(1)(B)

90.     Relator repeats and incorporates by reference the allegations above as if fully contained herein.

91.     As more particularly set forth in the foregoing paragraphs, by virtue of the acts alleged herein, the Defendants have "knowingly ma[de], use[d], or cause[d] to be made or used, a false record or statement – *i.e.*, the false certifications and representations made or caused to be made by the Defendants – to get a false or fraudulent claim paid or approved by the Government" in violation of 31 U.S.C. § 3729(a)(2).

92.     As a result of Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial, and the United States is entitled to at least $5,000 and as much as $11,000 for each such false or fraudulent claim submitted on or before November 2, 2015 and up to $21,563 for violations committed after November 2, 2015, plus three times the amount of the damages sustained by the Government for each and every violation of 31 U.S.C. § 3729 arising from Defendants' unlawful conduct as described herein. See 28 C.F.R. §§ 85.3(a)(9).

## COUNT III
### False Claims Act: Conspiracy to Commit a Violation
### U.S.C. § 3729(a)(1)(C)

93.     Relator repeats and incorporates by reference the allegations above as if fully contained herein.

94.     As more particularly set forth in the foregoing paragraphs, by virtue of the acts alleged herein, the Defendants and its agents have "conspire[d] to commit a violation of subparagraph (A), (B), (D)…or (G)" in violation of 31 U.S.C. §3729(a)(1)(C).

95.     As a result of Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial, and the United States is entitled to at least $5,000 and as much as $11,000 for each such false or fraudulent claim submitted on or before November 2, 2015 and up to $21,563 for violations committed after November 2, 2015, plus three times the amount of the damages sustained by the Government for each and every violation of 31 U.S.C. § 3729 arising from Defendants' unlawful conduct as described herein. See 28 C.F.R. §§ 85.3(a)(9).

## COUNT IV
### False Claims Act: Knowingly Delivers Less Than All of Government's Property in Defendants' Possession
### U.S.C. §3729(a)(1)(D)

96.     Relator repeats and incorporates by reference the allegations above as if fully contained herein.

97.     As more particularly set forth in the foregoing paragraphs, by virtue of the acts alleged herein, the Defendants "ha[d] possession, custody, or control of property or money used, or to be used, by the Government and knowingly deliver[ed], or cause[d] to be delivered, less than all of that money or property" in violation of 31 U.S.C. §3729(a)(1)(D).

98.     As a result of Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial, and the United States is entitled to at least $5,000 and as much as $11,000 for each such false or fraudulent claim submitted on or before November 2, 2015 and up to $21,563 for violations committed after November 2, 2015, plus three times the amount of the damages sustained by the Government for each and every violation of 31 U.S.C. § 3729 arising from Defendants' unlawful conduct as described herein. See 28 C.F.R. §§ 85.3(a)(9).

## COUNT V
### False Claims Act: Knowingly Conceals or Improperly Avoids an Obligation to Pay Money to the Government
### U.S.C. §3729(a)(1)(G)

99.    Relator repeats and incorporates by reference the allegations above as if fully contained herein.

100.    As more particularly set forth in the foregoing paragraphs, by virtue of the acts alleged herein, the Defendants "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases and obligation to pay or transit money or property to the Government: in violation of 31 U.S.C. §3729(a)(1)(G).

101.    As a result of Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial, and the United States is entitled to at least $5,000 and as much as $11,000 for each such false or fraudulent claim submitted on or before November 2, 2015 and up to $21,563 for violations committed after November 2, 2015, plus three times the amount of the damages sustained by the Government for each and every violation of 31 U.S.C. § 3729 arising from Defendants' unlawful conduct as described herein. See 28 C.F.R. §§ 85.3(a)(9).

## COUNT VI
### California Insurance Fraud Prevention Act
### California Insurance Code §1871.7

102.    Relator repeats and incorporates by reference the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

103.    Through the acts more particularly set forth in the foregoing paragraphs, Defendants knowingly employed marketeers, runners, steerers, or other persons to procure clients

or patients to whom Defendants could then provide services or benefits under a contract of insurance or that was the basis for a claim against an insured individual or his or her insurer.

104.    As a result of Defendants' conduct, the United States has been damaged, and continues to be damaged, in an amount to be determined at trial.

### PRAYERS FOR RELIEF

WHEREFORE, for each of these claims, the *qui tam* Plaintiff requests the following relief from each of the Defendants, jointly and severally, as to the federal claims:

- Three times the amount of damages that the Government sustains because of the acts of Defendants;

- A civil penalty of for each violation;

- An award to the *qui tam* Plaintiff for collecting the civil penalties and damages;

- Award of an amount for reasonable expenses necessarily incurred;

- Award of the *qui tam* Plaintiff's reasonable attorneys' fees and costs;

- Interest; and

- Such further relief as the Court deems just.

WHEREFORE, Relator, on behalf of the State of California, demand judgment against Defendants, ordering that:

- Defendants pay an amount not less than five thousand dollars ($5,000) plus an assessment of three times the amount of each fraudulent claim presented to an insurance company in violation of the IFPA.

- Relator be awarded the maximum amount allowed pursuant to the IFPA and/or any other applicable provision of law;

- Relator be awarded all costs and expenses of this action, including attorneys' fees

as provided by the IFPA and/or any other applicable provision of law;

- Relator be awarded such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Relator hereby demands a trial by jury as to all issues.

By: _____
Ronald Karz, Esq.
MUELLER LAW OFFICES
404 West 7th Street
Austin, X 78701
Telephone: (512) 478-1236
Facsimile: (512) 478-1473
Ronald.karz@muellerlaw.com

William L. Hurlock, Esq.
MUELLER LAW LLC
363 Bloomfield Avenue
Suite 2-C
Montclair, New Jersey 07042
Telephone:  (973) 233-8290
Facsimile: (973) 509-9521
William.Hurlock@muellerlaw.com

*ATTORNEYS FOR RELATOR*

Court Name: USDC California Southern
Division: 3
Receipt Number: CAS125086
Cashier ID: afuller
Transaction Date: 10/23/2020
Payer Name: Mueller Law LLC
---
CIVIL FILING FEE
  For: Mueller Law LLC
  Case/Party: D-CAS-3-20-CV-002085-001
  Amount:        $400.00
---
CHECK
  Check/Money Order Num: 1321
  Amt Tendered:  $400.00
---
Total Due:       $400.00
Total Tendered:  $400.00
Change Amt:      $0.00


There will be a fee of $53.00
charged for any returned check.